MATTHEW A. MACDONALD, SBN 255269
TREVOR N. TEMPLETON, SBN 308896
CHRISTOPHER M. HURLEY, SBN 350153
MADELYN Y. CHEN, SBN 346126
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
953 East 3rd Street, Suite 100
Los Angeles, CA 90013-1952
Telephone: (323) 210-2900
Facsimile: (866) 974-7329
Email: matthew.macdonald@wsgr.com
ttempleton@wsgr.com
churley@wsgr.com
madelyn.chen@wsgr.com

CAITLIN MCKELVIE, *pro hac vice*
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
95 S. State Street, Suite 1000
Salt Lake City, UT 84111
Telephone: (801) 401-8510
Facsimile: (866) 974-7329
Email: cmckelvie@wsgr.com

Attorneys for Defendants
LIVERAMP HOLDINGS, INC. and
LIVERAMP, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTINE RIGANIAN and DONNA SPURGEON, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>LIVERAMP HOLDINGS, INC., and LIVERAMP, INC. *corporations organized under the laws of the State of Delaware*,<br><br>Defendants. | Case No.: 4:25-cv-824-JST<br><br>**MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Before: Hon. Judge Jon S. Tigar<br>Date: July 17, 2025<br>Time: 2:00 p.m. |

## TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ........ 1
MEMORANDUM OF POINTS AND AUTHORITIES ........ 1
I. INTRODUCTION ........ 1
II. BACKGROUND ........ 3
A. LiveRamp's Services ........ 3
B. The Plaintiffs ........ 6
C. Plaintiffs' Legal Claims ........ 7
III. LEGAL STANDARD ........ 7
IV. ARGUMENT ........ 8
A. Plaintiffs Fail to State an Invasion of Privacy Claim (Counts 1 & 2). ........ 8
1. Plaintiffs Fail to Allege a Reasonable Expectation of Privacy. ........ 8
2. Plaintiffs Fail to Allege Any "Highly Offensive" Invasion. ........ 13
3. California's Privacy Laws Foreclose This Claim. ........ 16
4. Plaintiffs' Claims About Data Marketplace Fare No Better. ........ 17
B. Plaintiffs Fail to State a Claim Under CIPA or the ECPA (Counts III & IV). ........ 19
1. LiveRamp's Clients Consented to Any Alleged Interception. ........ 20
2. LiveRamp Did Not Read Communications "In Transit." ........ 20
3. Plaintiffs Fail to Plausibly Allege that LiveRamp Operated an Illegal "Pen Register" in Violation of CIPA Section 638.51. ........ 22
C. Plaintiffs Cannot Bring a Standalone Unjust Enrichment Claim (Count V). ........ 25
D. Plaintiffs' Duplicative Claim for Declaratory Judgment Fails (Count VI). ........ 25
V. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 7, 8, 12

*Asia Econ. Inst. v. Xcentric Ventures LLC*,
2011 WL 2469822 (C.D. Cal. May 4, 2011) .......... 17

*Belaire-West Landscape, Inc. v. Super. Ct.*,
149 Cal. App. 4th 554 (2007) .......... 9

*Bell Atl. v. Twombly*,
550 U.S. 544 (2007) .......... 8

*Bittner v. United States*,
598 U.S. 85 (2023) .......... 20

*Cabral v. Supple, LLC*,
2012 WL 12895825 (C.D. Cal. Oct. 3, 2012) .......... 9

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) .......... 17, 19

*Conohan v. Rad Power Bikes Inc.*,
2025 WL 1111246 (C.D. Cal. Apr. 3, 2025) .......... 25

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023) .......... 14, 15

*Cox Broad. Corp. v. Cohn*,
420 U.S. 469 (1975) .......... 9

*Day v. City of Fontana*,
25 Cal. 4th 268 (2001) .......... 23

*Doe v. WebGroup Czech Republic, a.s.*,
2025 WL 879562 (C.D. Cal. Feb. 21, 2025) .......... 19

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) .......... 17

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008) .......... 18

*Farst v. AutoZone, Inc.*,
700 F. Supp. 3d 222 (M.D. Pa. 2023) .......... 9

*Folgelstrom v. Lamps Plus, Inc.*,
195 Cal. App. 4th 986 (2011) .......... 3, 14, 15

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) .......... 18

*Gonzalez v. Google LLC*,
2 F.4th 871 (9th Cir. 2021) .......... 18

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) .......... 14, 24

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024) .......... 11, 15

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) .......... 8, 25

*Harrott v. Cnty. of Kings*,
25 Cal. 4th 1138 (2001) .......... 20

*Hart v. TWC Prod. & Tech. LLC*,
526 F. Supp. 3d 592 (N.D. Cal. 2021) (Tigar, J.) .......... 11

*Hazel v. Prudential Fin., Inc.*,
2023 WL 3933073 (N.D. Cal. June 9, 2023) .......... 21

*Heeger v. Facebook*,
509 F. Supp. 3d 1182 (N.D. Cal. 2020) .......... 10

*Hill v. Nat'l Collegiate Athletic Assn.*,
7 Cal. 4th 1 (1994) .......... 8

*Hubbard v. Google LLC*,
2024 WL 3302066 (N.D. Cal. July 1, 2024) .......... 14, 15, 16

*I.C. v. Zynga, Inc.*,
600 F. Supp. 3d 1034 (N.D. Cal. 2022) .......... 9, 13, 15

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 8, 11, 12, 15, 16, 17

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 8

*In re Google Inc.*,
806 F.3d 125 (3d Cir. 2015) .......... 11

*In re Google, Inc. Privacy Policy Litig.*,
58 F. Supp. 3d 968 (N.D. Cal. 2014) .......... 14, 15

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) .......... 14

*In re Nickelodeon Consumer Privacy Litig.*,
827 F.3d 262 (3d Cir. 2016) .......... 11

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) .......... 10

*In re Zerbe*,
60 Cal. 2d 666 (1964) .......... 24

*James v. Allstate Ins.*,
2023 WL 8879246 (N.D. Cal. Dec. 22, 2023) .......... 22

*Joseph v. Amazon.com, Inc.*,
46 F. Supp. 3d 1095 (W.D. Wash. 2014) .......... 18

*Katz-Lacabe v. Oracle America, Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) .......... 13, 20, 25

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016) .......... 18

*La Park La Brea A LLC v. Airbnb, Inc.*,
285 F. Supp. 3d 1097 (C.D. Cal. 2017) .......... 18, 19

*Lee v. Amazon.com, Inc.*,
76 Cal. App. 5th 200 (2022) .......... 18

*Licea v. Hickory Farms LLC*,
2024 WL 1698147 (Cal. Super. Ct. Mar. 13, 2024) .......... 24

*Lloyd v. Facebook, Inc.*,
2022 WL 4913347 (N.D. Cal. Oct. 3, 2022) .......... 17

*Love v. Ladder Financial, Inc.*,
2024 WL 2104497 .......... 21

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012) .......... 8, 9, 10, 14, 16

*Massie v. Gen. Motors LLC*,
2022 WL 534468 (D. Del. Feb. 17, 2022) .......... 10

*McCoy v. Alphabet, Inc.*,
2021 WL 405816 (N.D. Cal. Feb. 2, 2021) .......... 14

*Med. Lab'y Mgmt. Consultants v. Am. Broad. Companies, Inc.*,
306 F.3d 806 (9th Cir. 2002) .......... 14

*People v. Arias*,
45 Cal. 4th 169 (2008) .......... 20

*Planet Green Cartridges, Inc. v. Amazon.com, Inc.*,
2023 WL 8943219 (C.D. Cal. Dec. 5, 2023) .......... 18

*Romero v. Dep't Stores Nat'l Bank*,
725 Fed. App'x 537 (9th Cir. 2018) .......... 16

*Russell v. Walmart, Inc.*,
680 F. Supp. 3d 1130 (N.D. Cal. 2023) (Tigar, J.) .......... 25

*Saeedy v. Microsoft Corp.*,
2023 WL 8828852 (W.D. Wash. Dec. 21, 2023) .......... 10

*Sanchez v. Cars.com Inc.*,
2025 WL 487194 (Cal. Super. Ct. Jan. 27, 2025) .......... 24, 25

*Sanchez v. Los Angeles Dep't of Transp.*,
2021 WL 1220690 (C.D. Cal. Feb. 23, 2021) ........ 13, 24

*Shah v. Fandom, Inc.*,
2024 WL 4539577 (N.D. Cal. Oct. 21, 2024) ........ 24

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ........ 10

*Smith v. Facebook, Inc.*,
745 Fed. App'x 8 (9th Cir. 2018) ........ 10

*State v. Mixton*,
250 Ariz. 282 (2021) ........ 10

*Thomas v. Papa Johns Int'l, Inc.*,
2024 WL 2060140 (S.D. Cal. May 8, 2024) ........ 9, 14

*Torres v. Prudential Fin., Inc.*,
2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) ........ 3, 21, 22

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) ........ 10

*Valenzuela v. Keurig Green Mountain, Inc.*,
674 F. Supp. 3d 751 (N.D. Cal. 2023) ........ 21

*Williams v. DDR Media, LLC*,
757 F. Supp. 3d 989 (N.D. Cal. 2024) ........ 22

*Zarif v. Hwareh.com, Inc.*,
2025 WL 486317 (S.D. Cal. Feb. 13, 2025) (Bashant, J.) ........ 24

**STATUTES**

18 U.S.C. § 2510 ........ 7

18 U.S.C. § 2511(2)(d) ........ 20

Cal. Civ. Code § 1798.100 ........ 1, 4, 7, 16, 17

Cal. Civ. Code § 1798.110(a) ........ 6

Cal. Civ. Code § 1798.115 ........ 4

Cal. Civ. Code § 1798.120 ........ 4

Cal. Civ. Code § 1798.121 ........ 4

Cal. Penal Code § 630 ........ 7

Cal. Penal Code § 631 ........ 20, 21, 22

Cal. Penal Code § 637.2 ........ 20

Cal. Penal Code § 638.50 ........ 23

Cal. Penal Code § 638.51 .......... 20, 22, 23
Cal. Penal Code § 638.52 .......... 23

**RULES**

Fed. R. Civ. P. 12(b)(6) .......... 1

**MISCELLANEOUS**

Restatement (Second) of Torts § 652D, Comment b) .......... 9

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on July 17, 2025 at 2 p.m. or as soon thereafter as this matter may be heard, Defendants LiveRamp Holdings, Inc., and LiveRamp, Inc. ("LiveRamp") will and hereby do move this Court to dismiss Plaintiffs Christine Riganian's and Donna Spurgeon's First Amended Class Action Complaint (the "Complaint"). This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, all documents in the Court's file, any matter of which this Court may take judicial notice, and on such other written and oral argument as may be presented to the Court. LiveRamp requests that the Court grant its motion and issue an order dismissing Plaintiffs' Amended Complaint in its entirety and with prejudice.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Plaintiffs ask the Court to legislate. If adopted, Plaintiffs' theory would impose sweeping new rules for the online advertising industry and deem illegal longstanding practices that help keep the internet free. This theory finds no support in the law. Worse, it explodes the careful balance that California voters struck in 2020 when they enacted The California Privacy Rights Act ("CPRA") through Proposition 24, a statewide ballot initiative.[1]

That law created detailed rules governing companies that collect, analyze, and store consumer data. Far from banning the collection of such data for use in advertising, voters expressly determined that "advertising-supported services … can be a great model for consumers and businesses alike." Prop. 24 § 2(i). Prop 24 created a dedicated privacy agency to pass regulations that "balance" privacy interests with the needs of "business and innovation." *Id.* § 24.7(l). Plaintiffs do not allege that LiveRamp violated any of these rules. Instead, Plaintiffs ask the Court to upend that regime and condemn much of what makes targeted advertising work.

According to the Amended Complaint, LiveRamp offers two principal services: (i) "Identity Resolution"—a service, Plaintiffs claim, that allows advertisers to reach their target

---

[1] Proposition 24, The California Privacy Rights Act of 2020 (codified at Cal. Civ. Code § 1798.100) ( "Prop 24") § 2(I), attached as Exhibit B to the Declaration of Trevor Templeton.

audiences on digital platforms *without* exchanging personally identifiable information; and (ii) "Data Marketplace"—a platform where third parties are alleged to buy and sell pseudonymized data. Plaintiffs also allege that LiveRamp collects certain information about browsing activity on websites that have chosen to activate a LiveRamp tool, and that it uses this information to facilitate targeted ad delivery. Plaintiffs claim that this routine commercial conduct violates Plaintiffs' privacy rights, the California Invasion of Privacy Act ("CIPA"), and the Electronic Communications Privacy Act of 1986 ("ECPA"), and that LiveRamp has been unjustly enriched.

Plaintiffs also accuse a product that they call Attribute Enrichment. Plaintiffs' allegations about that product are based on a misreading of information on LiveRamp's website. LiveRamp will disprove those allegations and anticipates moving for summary judgment on any claim concerning that product after appropriate discovery. But because the allegations about Attribute Enrichment allege that LiveRamp has de-pseudonymized data, LiveRamp is not moving to dismiss Counts I, II, or VI, as related to that product. To be clear, LiveRamp *is* moving to dismiss Counts III, IV, and V as to all products because those counts do not implicate Attribute Enrichment. As to LiveRamp's other products, all Plaintiffs' claims fail as a matter of law.

***First***, Plaintiffs' common law and constitutional claims (Counts I and II) fail because Plaintiffs have not (i) plausibly alleged either that they had a reasonable expectation of privacy in their identifying information or internet activities, or (ii) cleared the "high bar" of pleading that any intrusion was "highly offensive." Courts have long recognized that users of the internet have limited expectations of privacy. Here, there is no allegation that LiveRamp (or any of its customers) made misrepresentations about the data it was collecting or how it would be used. LiveRamp is not plausibly alleged to have engaged in "comprehensive" tracking of users' internet activity; rather, LiveRamp's cookies are alleged to be installed only on select customers' websites. None of the information that LiveRamp allegedly collected about Plaintiffs can fairly be called "sensitive." LiveRamp's conduct is nothing more than "routine commercial behavior," that is not actionable. *See Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 992 (2011). Further, to the extent Plaintiffs' claims arise out of the operation of Data Marketplace, those claims are barred by Section 230 of the Communications Decency Act (among other reasons).

***Second***, Plaintiffs' CIPA "interception" claim (Count III) fails because Plaintiffs have not alleged that LiveRamp reads or attempts to read or understand any allegedly intercepted communications while those communications are in transit. *Torres v. Prudential Fin., Inc.*, 2025 WL 1135088, at *5 (N.D. Cal. Apr. 17, 2025). Plaintiffs' ECPA interception claim (Count IV) fails because ECPA is a one-party consent statute, and Plaintiffs do not allege that LiveRamp's tracking pixels were placed on any website without that website owner's consent.

***Third***, Plaintiffs' CIPA pen register claim (Count III) fails because the statute applies to devices that record *telephonic* activity, not to software that collects information about web browsing activity. This CIPA provision is a penal statute which must be narrowly construed. There is no indication in the statutory text or the legislative history that the Legislature intended it to cover anything other than traditional phone activity. For this reason, multiple California courts have held that the pen register statute does not apply to the technology at issue here.

***Finally***, Plaintiffs' unjust enrichment claim (Court V) fails to plead a quasi-contract and is thus barred by Ninth Circuit authority. And because all of Plaintiffs' other claims fail, so does their claim for declaratory relief (Count VI) as to all alleged conduct aside from Attribute Append, as discussed above. Plaintiffs have already had one chance to amend their pleadings in response to a motion to dismiss. Their amendments do not correct the fundamental defects in their legal theories. Future changes would be equally futile warranting dismissal with prejudice.

## II. BACKGROUND

### A. LiveRamp's Services

LiveRamp is a technology company and registered data broker. (AC ¶ 40.) It primarily provides services that enable advertisers to deliver targeted ads across digital platforms, a function that helps keep the internet free. *See* Prop 24 § 2(I). LiveRamp's business is heavily regulated by California agencies, Prop 24, and other related state and federal laws. California's laws in this regard adopt an opt-out approach, rather than requiring affirmative consent or prohibiting data collection. *See* Cal. Civ. Code §§ 1798.100, 1798.115, 1798.120, 1798.121.

Although the Amended Complaint repeatedly acknowledges the existence of this legal regime (*e.g.*, AC ¶¶ 138, 145-147), Plaintiffs do not allege that LiveRamp violated any of these

laws or regulations. Nevertheless, Plaintiffs' prolix complaint broadly characterizes LiveRamp as a "Privacy Death Star" that enables a "massive" and unlawful "identity surveillance system." (*Id.* ¶¶ 1, 3, 56.) Plaintiffs' allegations focus on two "principal services" that LiveRamp offers, namely "Identity Resolution" and "Data Marketplace." (*Id.* ¶ 57.) In describing these services below, LiveRamp accepts *arguendo* (as it must) Plaintiffs' well-pleaded allegations but notes for the record its vigorous disagreement with many of them.

**Identity Resolution.** Identity Resolution improves the process of targeted ad delivery by allowing advertisers to reach customers across different platforms. Consider an advertiser (*e.g.*, a shoe company) that wants to reach identified customers when they visit another website that sells advertising space (*e.g.*, a news website). Identity Resolution works to match the customers on the shoe company's list with visitors to the news website. (*See id.* ¶¶ 83 *et. seq.*)

It does this by assigning individuals an identifier called a "RampID"—a pseudonymous identifier consisting of strings of alphanumerical characters that are meaningless to a human reader. (*See id.* ¶¶ 1, 3, 57, 58.) LiveRamp allegedly constructs RampIDs by collecting both offline and online data about individuals. (*Id.* ¶ 58.) The offline data consists of basic information like names, emails, addresses, driver's license data, and social security numbers. (*Id.* ¶¶ 58, 64-69.) According to Plaintiffs, LiveRamp uses software to "infer[] connections" between different these offline identifiers and can consolidate them into a RampID. (*Id.* ¶¶ 3, 17, 59, 65, 71). The Amended Complaint does not allege that the manner of the collection of this data is unlawful. In fact, Plaintiffs acknowledge that LiveRamp collects this information from "public record data, publicly available data, and self-reported information." (*Id.* ¶ 65 (cleaned up).) This information is also readily available online about almost any person in the world at this point given the prolific spread of personal information on the internet.

The "online" identifiers consist of information LiveRamp obtains from "partner" websites, such as Google, allegedly by using common software tools such as Client-Side Tags, Web Match Tags, JavaScript code, and pixels. (*Id.* ¶¶ 72, 73, 76-79.) Online identifiers include cookie IDs, mobile IDs, and other identifiers tied to specific browsers or devices. LiveRamp allegedly consolidates these online identifiers with RampIDs to create an "identity graph," such

that a single RampID might stand in for multiple offline and online identifiers that are all associated inferentially with a single individual. (*Id.* ¶¶ 72, 80.)

Plaintiffs also allege that Identity Resolution includes the collection of internet browsing history. Specifically, Plaintiffs allege that for those websites on which its "Client-Side Tags" are installed, LiveRamp captures data such as pages viewed, additions to shopping carts, and "segment" and "category" information for products viewed, and then incorporates that data into individual profiles. (*Id.* ¶¶ 23-25, 78.) Plaintiffs further allege that these "Client-Side Tags" utilize a specific type of "JavaScript code" called "event listeners" that detect certain inputs from website visitors, such as "mouse clicks, keyboard presses, and scrolling[.]" (*Id.* ¶ 79.)

Although the Amended Complaint liberally uses words like "manipulation" and "surveillance," LiveRamp is not alleged to be doing any of this out of curiosity or prurient interest. Rather, LiveRamp is alleged to be performing these tasks to help advertisers reach prospective customers across different advertising platforms. (*Id.* ¶¶ 83-88.)

Plaintiffs do not allege that these processes result in the sharing of *any* identifying personal information. To the contrary, Plaintiffs concede that RampIDs are *pseudonymized* (*id.* ¶¶ 3, 90), meaning they cannot be tied to identifiable people without additional information. Indeed, conclusory assertions aside (*see, e.g.*, *id.* ¶ 58), Plaintiffs do not allege that anyone has ever de-pseudonymized a RampID to identify a person tied to the RampID. In fact, documents cited in the Amended Complaint reveal that LiveRamp uses multiple security measures to "ensure [that] RampIDs cannot be directly tied back to PII." (*Interpreting RampID, LiveRamp's People-Based Identifier*, LIVERAMP, https://docs.liveramp.comIconnectienlinterpreting-rampid,-liveramp-s-people-basedidentifier.html [https://perma.cc/LC62-K3V2] (quoted at AC ¶ 6, n.3).)

**Data Marketplace.** The second "principal service[]" identified in the Amended Complaint is Data Marketplace. (AC ¶¶ 94-107.) Data Marketplace is a platform that enables third-party buyers and sellers—such as TransUnion and Experian—to access and share consumer data for advertising purposes. (*Id.* ¶¶ 95-97; *id.* ¶ 118-125.) Plaintiffs vaguely suggest that LiveRamp offered certain "bespoke" or "custom" segments on Marketplace, and that these are content of LiveRamp's "own creation." (*Id.* at ¶¶ 113-117, 126-131.) But they fail to identify

specifically any such segments or explain why those segments are privacy invasive.

Although Plaintiffs allege that there are, or previously were, what they call "highly intimate, sensitive, and intrusive" segments available for sale by third parties on the Data Marketplace (*id.* ¶¶ 97-98), Plaintiffs plead no facts concerning how those segments were constructed or how the data was collected. Plaintiffs describe segments about users of "Grindr" but plead no facts about what notice, consent, or choice may have been given for the collection or sharing of the underlying data or whether people in that segment are sensitive about disclosing that information. (*Id.* ¶ 97.) Critically, Plaintiffs do not allege that *they* are in any sensitive segment or that any of the "sensitive" segments were custom or bespoke. Leaving aside claims about Attribute Enrichment, there is no allegation that anyone ever de-pseudonymized any of this "sensitive" data obtained on Data Marketplace to tie it to a person's offline identity.

**B. The Plaintiffs**

Plaintiffs Riganian and Spurgeon are residents of California and Oregon, respectively, who claim to be "concerned citizens" who have been "surveilled" by LiveRamp. (AC ¶¶ 12, 13, 29.) Plaintiffs do not allege that LiveRamp violated any of their rights under the consumer protection statutes that their states have enacted to regulate the data broker industry.

Plaintiffs each requested and received a Subject Access Request ("SAR") report from LiveRamp. (*Id.* ¶¶ 14, 30.) The SAR reports allegedly show the "information LiveRamp [has] collected and processed" about each of the named Plaintiffs. (*Id.*) These reports purportedly contain, among other things, addresses where Plaintiffs have lived, emails they used, and online identifiers assembled about them. (*Id.*) SAR reports are requested and prepared in compliance with California law, Cal. Civ. Code § 1798.110(a), and there are no allegations that LiveRamp would have maintained such a document absent an express request from a consumer.

Tellingly, Plaintiffs fail to allege what sensitive information might be gleaned from their online activity as reflected in the SAR. Plaintiff Riganian alleges she visited the LA Times website, general health information websites, hulu.com, a bank website, and that she browsed for antacids on cvs.com. (*Id.* ¶¶ 22-27.) Plaintiff Spurgeon alleges she visited general health information websites, cvs.com, showtime.com, news websites, and svu.edu. (*Id.* ¶¶ 36-38.)

Plaintiffs acknowledge that the internet is awash in disclosures about data collection practices and that many websites use cookie pop ups that require consent. (*Id.* ¶¶ 155-158.) Plaintiffs' theory is *not* that the websites they visited failed to disclose the collection or sale of data or that LiveRamp misled them. They do not allege that they exercised their opt-out rights or that LiveRamp failed to honor those rights. Rather, their claim is that the internet is so important that it is unfair even to ask for consent (*id.* ¶ 150), that there are so many disclosures available that Plaintiffs cannot be asked to read and understand them (*id.* ¶¶ 155, 157), and thus, contrary to the law of California,[2] that *no* consent (whether opt-out or opt-in) could ever be effective.

**C. Plaintiffs' Legal Claims**

Plaintiffs assert six causes of action: (1) invasion of privacy under the California constitution; (2) intrusion upon seclusion under California common law; (3) violations of CIPA (both for wiretapping and for operating a "pen register"), Cal. Penal Code §§ 630 *et seq.*; (4) violations of ECPA, 18 U.S.C. § 2510 *et seq.*; (5) unjust enrichment; and (6) declaratory and injunctive relief. Arguing that California law should apply to their intrusion upon seclusion and unjust enrichment claims on behalf of a nationwide class (AC ¶¶ 187, 260), Plaintiffs seek to represent three different classes that include all adult United States or California consumers (1) whose "personal information" was "made available for sale or use," or (2) who had the contents of their electronic communications "intercepted" by LiveRamp tracking software. (*Id*. ¶ 164.)

## III. LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] sheer possibility that a defendant has acted unlawfully" is not enough. *Id.* Courts do not assume the truth of legal conclusions pleaded as factual allegations; nor do they accept as true allegations contradicted by judicially noticeable facts. *Id.* at 677-79; *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007).

---

[2] *See* Cal. Prop. 24 (2020), codified at Cal. Civ. Code § 1798.100, as amended.

## IV. ARGUMENT

### A. Plaintiffs Fail to State an Invasion of Privacy Claim (Counts 1 & 2).

Pleading a claim for a privacy intrusion in California requires a plaintiff to clear a "high bar." *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012); *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 830 (N.D. Cal. 2020). "Actionable invasions of privacy must be sufficiently serious in their nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the privacy right." *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 37 (1994). Because California's constitutional privacy claim and the tort of intrusion upon seclusion have virtually identical elements, "courts consider the claims together and ask whether: (1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020). Plaintiffs satisfy neither requirement. The courts have long recognized that, because of the nature of the internet, its users have limited reasonable expectations of privacy. Plaintiffs' claim that LiveRamp's conduct was "highly offensive" is in fundamental tension with the decisions of the voters and the California Legislature, who have both endorsed disclosure and the opt-out process as the appropriate way to balance regulation of data collection on the internet.

#### 1. Plaintiffs Fail to Allege a Reasonable Expectation of Privacy.

Plaintiffs have not plausibly alleged that LiveRamp's conduct violated their reasonable expectations of privacy. When determining whether such an expectation exists, "courts consider … the customs, practices, and circumstances surrounding a defendant's particular activities." *Facebook*, 956 F.3d at 601-02. The analysis considers both the sensitivity of the information and "whether the manner it was collected … violates social norms." *Id.* at 603. "[I]f the allegations show no reasonable expectation of privacy or an insubstantial impact on privacy interests," the claim may be dismissed "as a matter of law." *Low*, 900 F. Supp. 2d at 1025 (cleaned up); *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1089 (N.D. Cal. 2022).

To begin, LiveRamp's alleged compilation of *offline* "identifiers" (names, addresses, emails, and the like (*see* AC ¶¶ 14(a)-(b), 30(a)-(b)), is no different than maintaining a phone directory. Contact information is not confidential; it is "designed to be exchanged to facilitate

communication and is thus available through ordinary inquiry and observation." *I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1049 (N.D. Cal. 2022). Thus, the collection and use of names, emails, and similar identifiers does not violate Plaintiffs' reasonable expectation of privacy. *Id.*; *see also Cabral v. Supple, LLC*, 2012 WL 12895825, at *3 (C.D. Cal. Oct. 3, 2012); *Belaire-West Landscape, Inc. v. Super. Ct.*, 149 Cal. App. 4th 554, 561 (2007). That is particularly true where Plaintiffs allege that LiveRamp obtained the information from "public record data, publicly available data, and self-reported information." (*Id.*¶ 65 (cleaned up)). "[T]he interests in privacy fade when the information involved already appears in the public record." *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494–95 (1975); *see also Zynga*, 600 F. Supp. 3d at 1049 ("[T]there is no liability for giving publicity to facts about the plaintiff's life that are matters of public record …." (quoting Restatement (Second) of Torts § 652D, Comment b)).

Plaintiffs' allegations about the collection of driver's license and social security numbers (AC ¶¶ 17, 32) do not state a claim either. There is no allegation that LiveRamp has wrongfully *disclosed* that information or even that LiveRamp has failed to take care with such information. Nor is there any allegation that LiveRamp improperly obtained either in a manner that was wrongful or violated social norms. We are aware of no case holding that the *possession* of such information can state a claim. To the contrary, even disclosure of that information would not be so offensive as to support a claim. *Low*, 900 F. Supp. 2d at 1025.

Nor have Plaintiffs alleged that they have a reasonable expectation of privacy in the *online* information that LiveRamp collects. "Generally, the internet is not a place where users have a reasonable expectation of privacy." *Thomas v. Papa Johns Int'l, Inc.*, 2024 WL 2060140, at *1 (S.D. Cal. May 8, 2024). "Given the inherent nature of the internet, a number of courts have found that consumers do not have a reasonable expectation of privacy over their activity in that space." *Id.* at *2 (collecting cases); *see also Farst v. AutoZone, Inc.*, 700 F. Supp. 3d 222, 230 (M.D. Pa. 2023) ("Shopping on a public website, like shopping in a public store, is not an activity one can reasonably expect to keep private from the retailer."). After all, "in this age of information sharing and inter-connectivity, most of us understand that what we do on the internet is not completely private." *State v. Mixton*, 250 Ariz. 282, 293 (2021) (cleaned up). Only "the

dissemination or misuse of sensitive and confidential information" is protected. *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1041 (N.D. Cal. 2014). None of the data at issue here qualifies.

Digital identifiers associated with Plaintiffs—IP addresses, "cookies," "unique device identifiers," etc. (AC ¶¶ 14(c)-(e), 30(c)-(e))—do not qualify. *See Heeger v. Facebook*, 509 F. Supp. 3d 1182, 1189 (N.D. Cal. 2020) (finding no "legally protected privacy interest in IP addresses"); *United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) (finding that "e-mail and Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit"); *Massie v. Gen. Motors LLC*, 2022 WL 534468, at *5 (D. Del. Feb. 17, 2022) ("Plaintiffs fail to explain how [Defendants'] possession of anonymized, non-personal data regarding their browsing activities on GM's website harms their privacy interests in any way."); *see also Saeedy v. Microsoft Corp.*, 2023 WL 8828852, at *4 (W.D. Wash. Dec. 21, 2023) (holding that "mouse movements, clicks, keystrokes, keywords, URLs of web pages visited, product preferences, interactions on a website, search words typed into a search bar, user/device identifiers, anonymized data, product selections added to a shopping cart, and website browsing activities" are not private).

As for browsing histories, Plaintiffs plead no facts suggesting there was anything sensitive about their interactions with websites where they were allegedly tracked. *See Low*, 900 F. Supp. 2d at 1025 (holding web users had no reasonable expectation of privacy in URLs that, in aggregate, disclosed their browsing history on a social media platform). The handful of websites or webpages alleged to have LiveRamp "tracking mechanisms"—healthline.com, cvs.com, abcnews.go.com, and the like (AC ¶¶ 26, 37)—are hardly the type that courts have found to count as "sensitive." At most, Plaintiffs say that Riganian viewed a product listing for a common, over-the-counter antacid on cvs.com. (AC ¶¶ 22.) As a matter of law, this is not the kind of "sensitive" information that can create an expectation of privacy. *See Smith v. Facebook, Inc.*, 745 Fed. App'x 8, 9 (9th Cir. 2018) (browsing for publicly available health information is not "so sensitive" because doing so "cannot, in and of itself, reveal details of an individual's health status or medical history"); *see also Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 954–55 (N.D. Cal. 2017) (explaining that web pages "contain[ing] general health information" are not

"protected health information" because they do not relate to "the past, present, or future physical or mental health or condition of an individual" (citation omitted)).

Nor do Plaintiffs suggest that any website listed in the Amended Complaint collected or shared their information in violation of an applicable privacy policy. For example, although Riganian complains about LiveRamp allegedly receiving a cvs.com URL, she does not allege that CVS promised to keep this information secret. CVS's privacy policies state the opposite.[3] LiveRamp itself publicly discloses how its services work; after all, Plaintiffs drafted their lengthy complaint by summarizing (and mischaracterizing) dozens of LiveRamp's own public disclosures. (*See, e.g.*, AC ¶¶ 2-4, 53-60, 62, 65-68.) Such disclosures defeat any expectation of privacy. *See Hammerling v. Google, LLC*, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024).

Nor can Plaintiffs invoke *Facebook* to argue that the *aggregation* of individually unprotected information creates an expectation of privacy. There, after expressly promising not to, Facebook tracked logged-out users *everywhere* they went online and then consolidated that information with information-rich Facebook profiles. *Facebook*, 956 F.3d at 599, 603, 606 n.8. The stark differences between this case and *Facebook* underscore the flaws in Plaintiffs' case:

**(1) The disclosures are different.** In *Facebook*, the "critical fact" was that Facebook "affirmatively stated that logged-out user data would not be collected" and thus had itself "set an expectation" of privacy that might not otherwise exist. 956 F.3d at 602-03.[4] Here, there is no such allegation. In fact, Plaintiffs acknowledge that copious disclosures exist online about both LiveRamp's and its customers' data collection practices. (AC ¶¶ 157-158.)[5] Plaintiffs chose not

---

[3] CVS's Privacy Policy expressly discloses that it collects (among other things) "the areas or pages of our Services that you visit" and "items placed or left in your shopping cart on the Site" and that it shares data with third parties. CVS Pharmacy, *Privacy Policy*, https://www.cvs.com/retail/help/privacy_policy (last visited May 17, 2025). The other cited websites have similar policies. *See, e.g.*, GoodRx, *Privacy Policy*, https://www.goodrx.com/about/privacy-policy (last visited May 17, 2025).

[4] Indeed, such a misrepresentation is present in virtually every case to have found a reasonable expectation of privacy in online activity. *See, e.g.*, *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 266 (3d Cir. 2016); *In re Google Inc.*, 806 F.3d 125 (3d Cir. 2015); *Hart v. TWC Prod. & Tech. LLC*, 526 F. Supp. 3d 592, 605 (N.D. Cal. 2021) (Tigar, J.).

[5] Plaintiffs complain that LiveRamp's privacy policies do not mention the Data Marketplace (*Id.* ¶ 156), but of course LiveRamp's privacy notice plainly discloses that it sells certain categories of data and information about the Data Marketplace is readily publicly available.

(continued...)

to quote the contents of any such disclosures. (*Id.*) The reason is obvious: the disclosures clearly say that the websites will collect and share information with third parties like LiveRamp.

**(2) The "amount of data" is different.** In *Facebook*, plaintiffs alleged that Facebook tracked them *everywhere* they went, across *seven million* websites and used that data to build profiles about individuals. 956 F.3d at 596, 603. Here, both the Complaint and the Amended Complaint allege that LiveRamp's Client-Side Tags collect data from "hundreds" of websites, and that LiveRamp uses this information to build consumer profiles. (*Compare* Compl. ¶¶ 35, 84, *with* AC ¶¶ 36, 85.) The Amended Complaint additionally alleges that LiveRamp's "ATS trackers" are installed on 21,000 websites—although, tellingly, it does not allege that LiveRamp uses ATS trackers for profile building. (AC ¶ 79.) Whether the number is "hundreds" or 21,000, it is less than one half of one percent of the sites at issue in Facebook. (AC ¶¶ 35, 84.)

**(3) The "nature" of the data is different.** In *Facebook*, the defendant collected a "*comprehensive* browsing history of an individual, *no matter how sensitive the websites visited* …." 956 F.3d at 603 (emphasis added). Given the nature of content that exists in certain corners of the internet, "experience and common sense," *Iqbal*, 556 U.S. at 664, suggest that a truly comprehensive browsing history could indeed provide detailed facts about individuals' most intimate and personal affairs. Here, Plaintiffs have not alleged that LiveRamp's tracking extends to those corners. Plaintiffs list only a handful of specific websites that allegedly contained LiveRamp "tracking mechanisms." (AC ¶¶ 25, 35, 85.) Although Plaintiffs say these websites are "sensitive," the only *facts* alleged are that the websites relate to general health information or articles about "personal financial issues." (*Id.* ¶¶ 20, 35.) These allegations are far too vague and conclusory to clear the "high bar" of pleading a plausible privacy claim.

**(4) The "correlat[ions]" are different.** Facebook was alleged to "correlate" browsing history with "personal Facebook profiles," which could include information such as a user's "employment history and ... religious affiliations." 956 F.3d at 599. LiveRamp is not alleged to have anything remotely resembling a Facebook profile. Moreover, the Amended Complaint

---

https://liveramp.com/privacy/california-privacy-notice/; https://liveramp.com/data-marketplace/.

acknowledges that information with LiveRamp is pseudonymized, and thus not "correlated" to an identifiable person. As such there is no invasion of privacy. *Zynga*, 600 F. Supp. 3d at 1049 (no privacy claim where "anonymity is preserved"); *see Sanchez v. Los Angeles Dep't of Transp.*, 2021 WL 1220690, at *3 (C.D. Cal. Feb. 23, 2021) ("[A] person does not have a reasonable expectation of privacy over information that cannot even be connected to her.").

*Katz-Lacabe v. Oracle America, Inc.*, 668 F. Supp. 3d 928 (N.D. Cal. 2023), does not help Plaintiffs either. That case involved against Oracle, which provided identity resolution and a data marketplace. The court denied Oracle's motion to dismiss but held that it was a "close question" as to whether the plaintiffs had alleged enough detail to plausibly state a claim based on data aggregation. *Id.* at 942. Even assuming *Katz-Lacabe* was decided correctly, there is no close question here. Oracle's cookie was on 48,000 websites. (Oracle Compl.[6] ¶ 38.) Oracle also used a web plug-in installed on *15 million websites* to surreptitiously "track[] and record[]" browsing histories of over 1.9 billion web visitors and enable profiling that "follow[ed] them across the internet." (*Id.* ¶ 41.) These figures dwarf the numbers alleged here. (*See* AC ¶¶ 20, 35 (cookie on "hundreds" of websites) *id.* ¶ 79 (21,000 publishers with ATS).) And there are no well-pleaded allegations that LiveRamp tracks users everywhere they go online. Oracle claimed to know "everything ascertainable in electronic form about" about web users, (Oracle Compl. ¶ 49(b)), and touted its ability to predict behavior *better* than Facebook. (*Id.* ¶ 55; *see id.* ¶¶ 49, 59, 61 (Oracle's creation and sale of segments that "develop inferences about specific people" and "reveal sensitive, health-related" information and track everything about them from "where they live, to the media they consume, to the things they buy, [and] to the views they hold").)

**2. Plaintiffs Fail to Allege Any "Highly Offensive" Invasion.**

Even if Plaintiffs had a reasonable expectation of privacy in the information LiveRamp allegedly compiled, they have not plausibly alleged the intrusion was "highly offensive." An invasion of privacy is highly offensive only if it is "sufficiently serious in [its] nature, scope, and actual or potential impact to constitute an egregious breach of the social norms underlying the

[6] ECF No. 1, No. 3:22-cv-04792-SK, 2022 WL 22867093 (N.D. Cal. Aug. 19, 2022).

privacy right." *Low*, 900 F. Supp. 2d at 1025 (citation omitted). The Ninth Circuit has described that as requiring an "*exceptional* kind of prying into another's private affairs" akin to "taking the photograph of a woman in the hospital with a 'rare disease that arouses public curiosity'" or "using a telescope to look into someone's upstairs bedroom window for two weeks and taking 'intimate pictures.'" *Med. Lab'y Mgmt. Consultants v. Am. Broad. Companies, Inc.*, 306 F.3d 806, 819 (9th Cir. 2002). The issue can be decided on the pleadings. *Hubbard v. Google LLC*, 2024 WL 3302066, at *7 (N.D. Cal. July 1, 2024); *Thomas*, 2024 WL 2060140, at *6.

There is no allegation that LiveRamp collected specific types of information that are so sensitive that collecting them is an "egregious breach" of social norms. *Low*, 900 F. Supp. 2d at 1025 (citation omitted). Allegedly collecting a URL showing Riganian viewed an over-the-counter antacid, (AC ¶ 22), is not remotely like taking "intimate pictures" through a bedroom window, *Med. Lab'y*, 306 F.3d at 819, or "dissemination of photographs of [a] decapitated corpse," *Folgelstrom*, 195 Cal. App. 4th at 991-92. Indeed, the alleged conduct is less invasive than collecting a plaintiff's online searches for medical providers, which was deemed insufficient to state a claim in *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1124 (S.D. Cal. 2023).

Also absent is any allegation that LiveRamp disclosed facts about Plaintiffs in a highly offensive manner. Under the high bar established by California law, "[e]ven disclosure of personal information, including social security numbers, does not constitute an 'egregious breach of the social norms' …." *Low*, 900 F. Supp. 2d at 1025 (citation omitted).[7] Plaintiffs plead no facts showing that LiveRamp disclosed anything sensitive about them to a third party in a way that caused embarrassment or injury. (AC ¶¶ 3, 83, 90.) Courts "have consistently refused to characterize the disclosure of common, basic digital information to third parties as serious or egregious violations of social norms." *In re Google, Inc. Privacy Policy Litig.*, 58 F. Supp. 3d 968, 985 (N.D. Cal. 2014). Attribute Enrichment aside, there are no well-pleaded allegations

[7] *See In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (disclosure of "unique device identifier number, personal data, and geolocation information"); *Google Privacy Policy*, 58 F. Supp. 3d at 973-74 (names, private contact lists, and contents of emails); *McCoy v. Alphabet, Inc.*, 2021 WL 405816, at *8 (N.D. Cal. Feb. 2, 2021) (app usage data).

that LiveRamp has ever disclosed information in a personally identifiable way. *See Zynga*, 600 F. Supp. 3d at 1049. Mere speculation that this could *theoretically* happen is insufficient. *See Cousin*, 681 F. Supp. 3d at 1126 (conduct not highly offensive because even if the data "*could* be de-anonymized," there was no allegation that "anyone has *actually done so*" (emphases added)).

Moreover, for the reasons stated above (*see supra* at p. 11-13), *Facebook* is inapposite. Plaintiffs have failed to allege the "critical fact" behind *Facebook*—false representations about the scope of data collection. Indeed, the privacy policies for the websites that Plaintiffs claim to have visited disclose data collection and sharing. *See Hammerling*, 2024 WL 937247, at *3 (no highly offensive intrusion when policies disclosed collection). LiveRamp similarly publicly discloses its activity. Further, and unlike in *Facebook*, Plaintiffs do not allege that LiveRamp internally acknowledged that its conduct was wrongful. *Cf. Facebook*, 956 F.3d at 606.

LiveRamp's alleged conduct amounts to only legally permissible "routine commercial" practice in support of ad delivery, which requires dismissal of Plaintiffs' claim. *See Folgelstrom*, 195 Cal. App. 4th at 992. In *Folgelstrom*, the court affirmed dismissal of a consumer's invasion of privacy claim against an advertiser that surreptitiously collected their home address information and used that information to send targeted ads. *Id.* at 989-92. The court reasoned that even if the information was obtained through "questionable" means, no claim would lie unless the information was *used* in a highly offensive way. *Id.* at 993. Because the advertiser used the information to determine where to send the consumer advertising, the conduct was not highly offensive as a matter of law, and the privacy claim was properly dismissed. *Id.*

Similarly, in *Hubbard v. Google LLC*, the court dismissed the plaintiffs' privacy torts for failure to plead that Google's collection of their online "cookies and persistent identifiers" was highly offensive. 2024 WL 3302066, at *7. Google allegedly collected detailed information about the minor plaintiffs' online browsing activity, including their "searches run, videos watched," "purchase activity," "browsing history," and "device sensor data." *Id.* at *2. Nonetheless, the court dismissed plaintiffs' invasion of privacy claims on the ground that this data collection was routine commercial behavior. *Id.* at *7. The court distinguished *Facebook* (and similar cases) because *Hubbard* did not involve "secret or deceptive data collection" or "the

misappropriation of data stemmed from a data breach." *Id.* & n.9. "Without any such 'plus factors' … to elevate Defendants' conduct beyond the level of routine commercial behavior, Plaintiffs effectively ask the Court to characterize an entire industry as founded on tortious conduct. The Court cannot sanction that result." *Id.* at *7. The same result should follow here.

**3. California's Privacy Laws Foreclose This Claim.**

Ultimately, Plaintiffs' thesis is that aggregating data for ad delivery is inherently "highly offensive," irrespective of the quality of the disclosures, the nature of the opt-outs, or how the data is obtained. This sweeping theory cannot be reconciled with the "social norms underlying the privacy right," *Low*, 900 F. Supp. 2d at 1025 (cleaned up), as expressed by California voters. *See Romero v. Dep't Stores Nat'l Bank*, 725 Fed. App'x 537 (9th Cir. 2018) (legislature's judgment relevant to "highly offensive" analysis). California has enacted comprehensive laws governing the data industry, including both the CCPA and the CPA, enacted through Proposition 24. Although Plaintiffs cite snippets referencing these laws to suggest that targeted ad delivery is *malum in se*, voters determined otherwise. In enacting Proposition 24, California voters expressly determined that "[o]ne of the most successful business models for the internet has been services that rely on advertising to make money as opposed to charging consumers," and that "[a]dvertising-supported services have existed for generations and can be a great model for consumers and businesses alike." *See* Cal. Prop. 24 (2020) § 2(I) (Templeton Decl. Ex. B).

The voters and the Legislature did not ban data collection or deem consent impossible. (*Cf.* AC ¶¶ 149-163.) They did not even require companies that collect data for ad delivery to obtain affirmative consent. Instead, they enacted a regime that balanced the competing interests in privacy and access to a free and open internet by requiring registration of data brokers, mandating point-of-collection disclosures, limiting data collection, creating easy-to-use opt-*out* and correction mechanisms, among other safeguards. Cal. Civ. Code §§ 1798.100 *et seq.* Plaintiffs do not, and cannot, allege that LiveRamp has failed to comply with this regime. Instead, Plaintiffs ask the Court to upend this "balance" by substituting their own policy preferences for those expressed by the voters. This should not be permitted. California voters' decision to regulate rather than ban the industry on its face establishes that LiveRamp may

appropriately buy, sell, analyze, and aggregate data as routine commercial activity that is not an "egregious breach of the social norms." *Cf. Facebook*, 956 F.3d at 606 (citation omitted).

**4. Plaintiffs' Claims About Data Marketplace Fare No Better.**

Plaintiffs' claims related to the Data Marketplace similarly fail. As an initial matter, California law expressly contemplates the market for consumer data. *See* Cal. Civ. Code § 1798.100(d) (describing the "General duties" of companies that "sell" or "share" personal data). The mere fact that LiveRamp operates such a marketplace or allows others to sell data segments cannot constitute a "highly offensive" privacy violation. Plaintiffs must therefore plead something more than the sale of data to state a claim.

To the extent Plaintiffs hang their claims on the alleged presence on Data Marketplace of specific "sensitive" or "intimate" segments, their allegations are threadbare and conclusory. Plaintiffs do not even attempt to define what makes a segment "sensitive." They plead no facts about what data was used to create the segments, how the data was collected or processed, or what notice, choice, and consent options were given at the point of collection. Absent such facts, there is no plausible basis to conclude that these segments were created in a manner that intrudes on a reasonable expectation of privacy, much less that their existence is "highly offensive."

Even if Plaintiffs could clear that hurdle, their claim is barred by Section 230 of the Communications Decency Act. 47 U.S.C. § 230(c)(1). Courts interpret Section 230 as barring "a panoply of torts," including invasion of privacy. *Asia Econ. Inst. v. Xcentric Ventures LLC*, 2011 WL 2469822, at *7 (C.D. Cal. May 4, 2011); *Lloyd v. Facebook, Inc.*, 2022 WL 4913347, at *7 (N.D. Cal. Oct. 3, 2022). Section 230 immunity applies if (1) the defendant is a provider of an "interactive computer service," and (2) the claim seeks to hold the defendant liable as a "publisher or speaker" of (3) content provided by someone else. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019). "When a plaintiff cannot allege enough facts to overcome Section 230 immunity, a plaintiff's claims should be dismissed." *Id.*

Here, Plaintiffs' allegations about Data Marketplace concern LiveRamp's conduct as an interactive computer service provider. Courts interpret this term "expansively," *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003), to encompass websites and

marketplaces where parties exchange information online. *See Joseph v. Amazon.com, Inc.*, 46 F. Supp. 3d 1095, 1105 (W.D. Wash. 2014) (Amazon marketplace is an "interactive computer service") *Lee v. Amazon.com, Inc*., 76 Cal. App. 5th 200, 251 (2022) (similar); *see generally Kimzey v. Yelp! Inc*., 836 F.3d 1263, 1268 (9th Cir. 2016) (websites).

Plaintiffs' theory plainly seeks to hold LiveRamp liable for content posted by others. Setting aside Plaintiffs' allegations about so-called "bespoke" segments, which are discussed below, Plaintiffs acknowledge that segments are sold by third-party brokers. (AC ¶¶ 60, 99.) For those segments, Plaintiffs' theory can be "boiled down" to a claim that LiveRamp should have excluded that third-party content from the Marketplace and is therefore barred. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008). Courts have repeatedly dismissed analogous claims against other marketplace operators. *See, e.g., Planet Green Cartridges, Inc. v. Amazon.com, Inc.*, 2023 WL 8943219, at *5 (C.D. Cal. Dec. 5, 2023) (Section 230 barred claims against Amazon for products sold and content posted by third parties); *La Park La Brea A LLC v. Airbnb, Inc.*, 285 F. Supp. 3d 1097, 1106 (C.D. Cal. 2017) (Airbnb immune from liability for rental offerings).

Although the Amended Complaint added new allegations, (AC ¶¶ 113-132), none is sufficient to overcome LiveRamp's Section 230 immunity. *First*, allegations about LiveRamp's role in distributing segments—for example, dictating the format and presentation of data, facilitating transactions, activating data for ad delivery, and creating the "ecosystem" that allows Marketplace to function (AC ¶¶ 118-125)—are in the "heartland" of Section 230 protection. *See Gonzalez v. Google LLC*, 2 F.4th 871, 891 (9th Cir. 2021), *vacated and remanded on other grounds*, 598 U.S. 617 (2023); *accord Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019). Courts have found similar conduct insufficient as a matter of law to negate immunity. *See Airbnb*, 285 F. Supp. 3d 1097; *see also Roommates.Com*, 521 F.3d at 1169 ("providing neutral tools to carry out what may be unlawful" does not defeat Section 230 immunity).

*Airbnb*, 285 F. Supp. 3d 1097, is instructive. There, the plaintiffs alleged that various listings on Airbnb were for properties that were rented and that sub-letting those properties through Airbnb was a violation of the underlying leases. *Id.* at 1106. Airbnb provided a wide

range of services that enabled the listing of these properties, including "user information verification, messaging systems, photography, local occupancy tax collection and remittance, a pricing tool, host insurance, a guest refund policy, [and] an autocomplete search function." *Id.* at 1104. None of these were sufficient to defeat Airbnb's Section 230 immunity: "Airbnb hosts—not Airbnb—are responsible for" creating the lease-violating listings. *Id.* at 1105. "Airbnb merely provide[s] a framework that could be utilized for proper or improper purposes." *Id.*

The same reasoning applies here. Like Airbnb, LiveRamp's alleged services provide a framework for brokers to sell segments online. The mere fact that a third party could theoretically use the framework to sell sensitive segments does not make LiveRamp the publisher of those segments. *See id.*; *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124-25 (9th Cir. 2003). This is particularly true given that the complaint is "devoid of any allegations demonstrating that Defendants employ their traditional website features in a manner that distinctly targets or proliferates" the creation of sensitive segments rather than non-sensitive ones. *Doe v. WebGroup Czech Republic, a.s.*, 2025 WL 879562, at *7 (C.D. Cal. Feb. 21, 2025).

Plaintiffs' allegations about LiveRamp's role in creating "bespoke" or "curated" (AC ¶¶ 129-131) segments are equally defective. Plaintiffs do not identify any of the alleged "bespoke" segments, much less plead facts showing that any of those segments were sensitive or based on highly personal data obtained without consent. The Amended Complaint is also vague to the point of obfuscation on the nature of LiveRamp's alleged role in creating the alleged segments. Plaintiffs provide no well-pleaded allegations that LiveRamp contributed materially to the conduct that rendered the segments privacy-invasive. *See Doe*, 2025 WL 879562, at *4.

### B. Plaintiffs Fail to State a Claim Under CIPA or the ECPA (Counts III & IV).

Plaintiffs do not plausibly allege that LiveRamp's practices violate CIPA or ECPA. (AC ¶¶ 205-258.) Both claims address LiveRamp's alleged use of "Client-Side Tags" and "Enhanced Client-Side Tags." These tools allegedly use "pixels" and "event listeners" to collect browsing data. (*Id.* ¶¶ 78, 79, 90.) Plaintiffs allege that this software is an unlawful form of interception under ECPA and the second prong of CIPA Section 631(a) and that it constitutes an unlawful "pen register" in violation of CIPA Section 638.51. These claims fail as a matter of law.

Because CIPA is a criminal statute, which contains a civil right of action, *see* Cal. Penal Code § 637.2, it is subject to the rule of lenity. That rule requires courts to interpret ambiguous terms in the manner "favorable to the defendant," even when only civil penalties are sought. *See People v. Arias*, 45 Cal. 4th 169, 177 (2008); *Harrott v. Cnty. of Kings*, 25 Cal. 4th 1138, 1154 (2001) (civil application); *see also Bittner v. United States*, 598 U.S. 85, 103 (2023) (same).

Ignoring this bedrock precept, Plaintiffs advance interception and pen register claims that purport to extend CIPA's criminal prohibitions (and related provisions of the ECPA) to reach ordinary software functions that are integral to how the internet works. Practically speaking, these claims amount to an assertion that much of the internet is illegal. No well-pleaded factual allegation supports such an expansive conception of criminal and civil liability.

**1. LiveRamp's Clients Consented to Any Alleged Interception.**

Plaintiffs' ECPA claim must be dismissed because the ECPA is a one-party consent statute. 18 U.S.C. § 2511(2)(d). Absent inapplicable exceptions here, it is not unlawful to intercept a communication when "one of the parties to the communication has given prior consent.]" *Id.* Here, Plaintiffs allege only that the LiveRamp pixel operates on websites of LiveRamp clients who have chosen to enable it. (AC ¶¶ 209, 212.) There are no allegations that LiveRamp's pixel operates on websites without the consent of the operator. (AC ¶¶ 205-223.) Courts have dismissed ECPA interception claims based on similar allegations. In *Katz-Lacabe*, 668 F. Supp. 3d 928, plaintiffs alleged that Oracle collected digital identifiers using "tracking pixels (code embedded into webpages that track information whenever the webpage is opened)." *Id.* at 935-36. The court dismissed the ECPA interception claim: "Defendant's customers must have chosen to deploy Oracle's tools on their websites, it necessarily follows that 'one of the parties to the communication'—the websites themselves—gave 'prior consent to such interception.'" *Id.* at 945 (quoting 18 U.S.C. § 2511(2)(d)). The same result must follow here.[8]

**2. LiveRamp Did Not Read Communications "In Transit."**

Plaintiffs' CIPA Section 631(a) claim fails because Plaintiffs do not plausibly allege an

[8] The statute's "crime-tort exception" does not apply because LiveRamp's purpose is not to spy "but to make money." *Katz-Lacabe*, 668 F. Supp. 3d at 945; (*see* AC ¶¶ 1, 111, 256, 262).

essential element: that LiveRamp "read[], or attempt[ed] to read, or to learn the contents or meaning of" Plaintiffs' online communications while those communications were "in transit." *Love v. Ladder Financial, Inc.*, 2024 WL 2104497, at *1 (quoting Cal. Penal Code § 631(a)); *Torres v. Prudential Fin., Inc.*, 2025 WL 1135088, at *5 (N.D. Cal. Apr. 17, 2025).

The dual requirements of "read" and "in transit" set a high bar to pleading a Section 631(a) claim, particularly in the context of the internet. As courts have explained, "read" and "attempt to read" both "require[] some effort at understanding the substantive meaning of the message, report or communication." *Torres*, 2025 WL 1135088, at *5. And the term "in transit" means that this interpretative act must have occurred while the communication was in transmission and *before* it reached electronic storage. *Id.*; *see Hazel v. Prudential Fin., Inc.*, 2023 WL 3933073 (N.D. Cal. June 9, 2023) (emphasis added) (dismissing Section 631(a) claim when the plaintiff did not plausibly allege that defendant "read one of his communications *while it was still in transit, i.e., before it reached its intended recipient*"); *Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751, 758 (N.D. Cal. 2023) ("'While' is the key word here.").

Section 631(a)'s read-in-transit requirement is strictly enforced and requires dismissal when there is no showing of real-time interpretation. In *Torres*, for instance, the court dismissed at summary judgment a Section 631(a) claim based on the operation of "event listener" software that tracked internet users' actions on a website in real time. There, a website allowed users to request insurance quotes by completing a web form. Code on the website intercepted users' interactions with the web form, including "button clicks, mouse movements, and keyboard inputs" and transmitted them to a defendant. 2025 WL 1135088, at *1. The court held that the tracking software did not violate Section 631(a) because the data was not read while in transit, but stored on a server, where they could later be analyzed. This was not enough: "Whether Defendants access or even analyze inputs … after they have been transmitted to the server and reassembled has no bearing on whether Defendants read the communications while they were in transit." *Id.* at *5. The court acknowledged that the read-in-transit requirement makes it difficult to establish Section 631(a) violation in the context of the internet, "where communications are near instantaneous and cannot be meaningfully read or understood until later." *Id.* at *6. But "it

would stretch CIPA's statutory language too far to interpret 'while ... in transit' to encompass any hypothetical future attempt to read or understand the meaning of a communication." *Id.*

Even accepting Plaintiffs' well-pleaded allegations as true, Plaintiffs have not plausibly alleged that LiveRamp read or attempted to read any of their communications while they were *in transit*. Nor could they so allege. Plaintiffs' own theory is that LiveRamp's software transmits URLs and other inputs *instantaneously* "before the requested page is completely loaded on their devices" (AC ¶ 214), which is much too fast to permit real-time review. *See Torres*, 2025 WL 1135088, at *6 (difficulty of showing that "instantaneous" online communications were read in transit). At most, Plaintiffs have alleged that LiveRamp's tracking software "record[s] the data and stores it on its servers" for post-transmission analysis which is insufficient as a matter of law. *James v. Allstate Ins.*, 2023 WL 8879246, at *3 (N.D. Cal. Dec. 22, 2023) (no section 631 violation where defendant "recorded the data and store[d] it on its servers").

To the extent Plaintiffs pin their claim on LiveRamp's alleged use of event listeners or JavaScript code to automatically detect "email addresses and phone numbers" for collection or hashing, that will not work either. The court squarely rejected an identical argument in *Torres*, explaining that software that is programmed to detect personal information from within a web user's inputs "depends on a set of pre-determined criteria that is mechanically deployed with no intelligible understanding of those values required." *Torres*, 2025 WL 1135088, at *7. Such automated, predetermined functionality cannot "constitute[] an attempt to understand its meaning" as a matter of law. *Id.*; *Williams v. DDR Media, LLC*, 757 F. Supp. 3d 989, 995 (N.D. Cal. 2024) (holding that detection of data for hashing does not constitute "reading" under CIPA).

**3. Plaintiffs Fail to Plausibly Allege that LiveRamp Operated an Illegal "Pen Register" in Violation of CIPA Section 638.51.**

Plaintiffs' CIPA Section 638.51 claim (AC ¶¶ 224-240) fails because Plaintiffs have not plausibly alleged that LiveRamp's Client-Side Tags and Enhanced Client-Side Tags are unlawful "pen registers." Plaintiffs' theory cannot be squared with the relevant statutory text, the legislative history, or the applicable canons of construction. Indeed, if adopted, Plaintiffs' approach would effectively criminalize much of the internet.

The California Legislature enacted the pen register provision in 2015 through Assembly Bill 929 ("AB 929").[9] That Bill codified procedures governing the use of pen registers by law enforcement and prohibited the use of pen registers without a court order, subject to several exceptions. Cal. Penal Code § 638.51(a). The Bill defined "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b). Although internet usage was widespread by the time the law was enacted, neither the statutory text nor the legislative history referenced tracking or recording activity on the internet.

Other statutory provisions, which were enacted at the same time as the pen register prohibition, show that the law was intended to apply to devices used for *telephone* surveillance only: Penal Code Section 638.52(c) provides that a pen register may not collect the physical location of the subscriber "except to the extent that the location may be determined *from the telephone number*." *Id*. (emphasis added). Section 638.52(d) also states that any court order authorizing law enforcement to use a pen register must identify the person associated with the "*the telephone line to which the pen register ... is to be attached*." *Id.* (emphasis added).

The legislative history is to the same effect. *See Day v. City of Fontana*, 25 Cal. 4th 268, 272 (2001) (applying "legislative history" to construe ambiguous statutes). Assembly Bill 929's author's note equated pen registers with telephonic technology, explaining that pen registers "allow[] law enforcement officers to record all outgoing numbers *from a particular telephone line*." A.B. 929 cmt.1 (Cal. June 15, 2015) (emphasis added), Templeton Decl. Ex. A at 8. A committee report also described pen registers in expressly telephonic terms. *See* A.B. 929 at cmt. 2 (Cal. Apr. 7, 2015), Templeton Decl. Ex. D at 10 ("Pen registers … generally track *incoming and outgoing telephone calls*." (emphasis added)). As one court summarized while dismissing a pen register claim based on internet tracking software, the "pen register" definition references technology from "an era of cordless radio phones and cellular phones." *Licea v.*

---

[9] *See* A.B. 929, 2015-2016 Leg., 16th Sess. (Cal. 2015), (hereinafter "A.B. 929"), Templeton Decl. Ex. C.

*Hickory Farms LLC*, 2024 WL 1698147, at *2 (Cal. Super. Ct. Mar. 13, 2024).

If there was any doubt as to the reach of this provision, the rule of lenity requires the doubt to be resolved in favor of Defendants. Because CIPA is a penal statute, LiveRamp "must be given the benefit of every reasonable doubt as to whether the statute applies to [it]." *Sanchez v. Cars.com Inc.*, 2025 WL 487194, at *3 (Cal. Super. Ct. Jan. 27, 2025); *In re Zerbe*, 60 Cal. 2d 666, 668 (1964). The statute's text and the repeated references to telephonic communications in the legislative history make clear that CIPA's pen register provision was not intended to criminalize software that reveals web browsing activity. A contrary interpretation would outlaw a wide and indeterminate range of online activity that the Legislature never contemplated.

For these reasons, a growing body of cases have held that CIPA's pen register provisions do not apply to tracking on to the internet. In *Sanchez*, the Superior Court held that website code that "capture[d] outgoing information" from visitors and transmitted it to a third-party (for use in ad campaigns) was not a pen register. 2025 WL 487194, at *2. The court reasoned that the legislative history confirmed that the Legislature did not intend CIPA's pen register provision to apply to internet tracking software, only telephonic activity. *Id.* at *3. Similarly, in *Licea*, another Superior Court dismissed a CIPA claim alleging that an online retailer violated CIPA's pen register provision by capturing the plaintiff's IP address when the plaintiff visited its website. 2024 WL 1698147, at *4. The court found that the plaintiff's broad application of the pen register provision to encompass online communications would "potentially disrupt a large swath of internet commerce without further refinement as the precise basis of liability." *Id.*

While three federal judges have declined to dismiss software-based "pen register" claims at the pleading stage, none addressed the arguments favoring a narrower construction that LiveRamp advances here. *See Shah v. Fandom, Inc.*, 2024 WL 4539577, at *3 (N.D. Cal. Oct. 21, 2024); *Zarif v. Hwareh.com, Inc.*, 2025 WL 486317, at *4 (S.D. Cal. Feb. 13, 2025) (Bashant, J.); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (Bashant, J.); *Conohan v. Rad Power Bikes Inc.*, 2025 WL 1111246, at *6 (C.D. Cal. Apr. 3, 2025). None addressed the rule of lenity which *requires* narrow interpretations of criminal statutes to protect due process rights, and only one of these decisions considered (in a brief footnote) any legislative

history materials. That is presumably why other courts have deemed decisions like these unpersuasive. *See Sanchez*, 2025 WL 487194, at *3.

**C. Plaintiffs Cannot Bring a Standalone Unjust Enrichment Claim (Count V).**

Plaintiffs fail to plead the elements of unjust enrichment. "To allege unjust enrichment as an independent cause of action, a plaintiff must show that a defendant received and unjustly retained a benefit at the plaintiff's expense." *Russell v. Walmart, Inc.*, 680 F. Supp. 3d 1130, 1133 (N.D. Cal. 2023) (Tigar, J.). Plaintiffs must allege "mistake, fraud, coercion, or request" by LiveRamp and that Plaintiffs conferred a benefit on LiveRamp that would be unjust to retain. *Id*. Plaintiffs conclusorily allege that LiveRamp's "unauthorized use" of their "information for profit entitles them to profits unjustly earned." (AC ¶ 272.) But they do not explain, as they must, how LiveRamp's conduct rises to the level of mistake, fraud, coercion, or request. *See Russell*, 680 F. Supp. 3d at 1133 (dismissing unjust enrichment claim). In *Katz-Lacabe*, the court dismissed an unjust enrichment claim pled under a similar theory. *See Katz-Lacabe*, 668 F. Supp. 3d at 946 (plaintiffs "were at no time in direct privity" with defendant and "have neither directly expended their own resources, nor shown that their property has become less valuable"). The court explained that where, as here, "Plaintiffs challenge unjust enrichment based on the monetization of th[e] data" that the defendant "received and/or collected with permission from the third-party websites," the plaintiffs "must explain why the access they received to those websites would not defeat the unjust enrichment claim." *Id*. n.11. Plaintiffs' claims fail for the same reason.

**D. Plaintiffs' Duplicative Claim for Declaratory Judgment Fails (Count VI).**

The Declaratory Judgment Act "does not provide an independent theory for recovery." *Hammerling*, 615 F. Supp. 3d at 1097 (citation omitted). Declaratory relief is unavailable "if the underlying claims are dismissed." *Id.* Because all of Plaintiffs' claims must be dismissed, the Court should also dismiss Plaintiffs' Sixth Cause of Action (except as to Attribute Enrichment).

## V. CONCLUSION

For the foregoing reasons, all claims against LiveRamp should be dismissed.

Dated: May 19, 2025

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: */s/ Matthew A. Macdonald*
Matthew A. Macdonald
E-mail: matthew.macdonald@wsgr.com

Attorney for Defendants LIVERAMP, INC. and LIVERAMP HOLDINGS, INC.